# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JUAN GONZALEZ,
  Plaintiff,

v.

NANCY BERRYHILL,
  Defendant.

No. 3:18-cv-241 (SRU)

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In the instant Social Security appeal, Juan Gonzalez moves to reverse the decision by the

Social Security Administration ("SSA") denying his claim for disability insurance benefits or, in

the alternative, to remand the case for a new hearing. *See* Mot. to Reverse, Doc. No. 27, at 1.

The Commissioner of the Social Security Administration[1] (the "Commissioner") moves to affirm

the decision. *See* Mot. to Affirm, Doc. No. 30. For the reasons that follow, I **deny** Gonzalez's

motion and **grant** the Commissioner's.

## I.    Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708

F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373

n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not

working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.*

(citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does have a severe

---

[1] Since the filing of the case, Andrew Saul has been appointed the Commissioner of Social Security. The clerk is directed to substitute Andrew Saul for Nancy Berryhill on the docket of this case.

impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden of proving that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374–75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.     Facts[2]

Gonzalez applied for social security disability insurance ("SSDI") benefits on December 16, 2013 and for supplemental security income disability ("SSI") benefits on December 31, 2013, alleging that he was disabled because of back problems, stomach problems, and depression as of July 1, 2013. R. at 15. As set forth more fully below, Gonzalez's application was denied at each level of review. *Id.* He now seeks an order reversing the decision or in the alternative, remanding for a new hearing.

---

[2] The following facts are drawn primarily from the Joint Statement of Material Facts, doc. no. 27-1.

A.  Medical History

Gonzalez's back problems span over two decades.  On September 14, 1993, Gonzalez was diagnosed with a lumbo sacral sprain.  Joint Statement of Material Facts, Doc. No. 27-1, at 2 (citing R. at 537).  A radiology exam revealed L5-S1 narrowed disc space.  *Id*. (citing R. at 538).  In August and September 1994, a herniated disc was observed at the L4-L5 level.  *Id*. (citing R. at 540).

Gonzalez's low back pain persisted from 2011 through 2015.  On November 20, 2013, Andrew Yim, a nurse practitioner at Community Health Center, noted a decreased range of motion on the lumbar spine and prescribed Gonzalez Flexeril and Tramadol.  *Id*. at 3 (citing R. at 554).  An x-ray of the lumbar spine that was performed that day displayed disc height loss at L4-L5.  *Id*. (citing R. at 559).

 Shortly thereafter, on December 10, 2013, Gonzalez saw Dr. Koh, D.O., M.P.H., at Community Health Center, again for back pain.  R. at 552.  Dr. Koh observed that Gonzalez had lumbar spinal/paraspinal tenderness and a limp with ambulation.  *Id*.  Gonzalez complained that the Tramadol and Flexeril did not alleviate his pain, and Dr. Koh advised Gonzalez to continue taking Tramadol and Flexeril along with a new medication, Meloxicam.  Doc. No. 27-1, at 3 (citing R. at 552).  Dr. Koh also referred Gonzalez for an orthopedic assessment, and Gonzalez declined to pursue physical therapy because "it did not help him in the past."  *Id*. (citing R. at 552).  The neurological examination was reported as unremarkable.  *Id*. (citing R. at 552).

On January 22, 2014, Gonzalez was treated for worsening back pain at MidState Medical Center.  *Id*. (citing R. at 630).  According to the medical report, Gonzalez displayed tenderness in the back and a decreased range of motion secondary to pain.  *Id*. at 3 (citing R. at 632).  He was prescribed Percocet.  *Id.* (citing R. at 630).

On January 29, 2014, Gonzalez was examined for low back pain at Meriden Health Care. Doc. No. 27-1, at 4 (citing R. at 571). He reported that his Tramadol was not working and requested a stronger medication. *Id*. at 4 (citing R. at 571). Gonzalez's bone, joints, and extremities ("BJE") examination was normal; he was diagnosed with muscle spasm and referred to pain management. *Id*. (citing R. at 571).

Lyla Buckle-Natt, APRN, saw Gonzalez on three separate occasions in February 2014 for low back pain. *Id*. (citing R. at 572). Neurological and BJE exams performed at his appointment on February 4, 2014 produced normal results. *See id*. (citing R. at 572–73). His assessment was low back pain, insomnia, and depression, and he was prescribed Tramadol, Flexeril, Mirtazapine, and Wellbutrin. *Id*. (citing R. at 572–73). Those symptoms persisted and the diagnosis remained the same for the subsequent two visits. *Id*. at 4.

On March 9, 2014, Gonzalez was treated at MidState Medical Center for low back pain and muscle spasm. *Id*. (citing R. at 607). The examination showed that his lumbar paraspinal muscles were tender to palpation, as well as a normal range of function, normal gait, and an absence of radicular symptoms. *Id*. (citing R. at 609). He was prescribed Percocet. *Id*. (citing R. at 607–09).

Jesus Lago, M.D., conducted a psychiatric evaluation of Gonzalez on March 14, 2014. *Id*. (citing R. at 602–05). Dr. Lago observed that Gonzalez had a normal posture and gait, although he "did appear to be in pain." *Id*. (citing R. at 602). Gonzalez told Dr. Lago that "the pain is escalating and he cannot work due to the pain." R. at 602–03. Gonzalez also stated that he does "some light chores and cooking," and "does take care of" his daily activities. R. at 603. Dr. Lago made the following diagnoses: (1) depressive disorder, not otherwise specified; (2) low back pain with herniated discs and gastritis; (3) low back pain with herniated discs; and (4) a

Global Assessment of Function (GAF) of 68.  R. at 604.  Dr. Lago concluded that, "[f]rom a psychiatric standpoint, Mr. Gonzalez was capable of adopting to [a] work setting."  R. at 605.

On March 25, 2014, Warren Leib, Ph.D., a non-examining State Agency consultant, opined that Gonzalez suffered from severe DDD (disorders of back-discogenic and degenerative) and non-severe affective disorder.  R. at 262.  Dr. Leib determined that Gonzalez did not have restrictions with respect to the following activities: performing activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.  R. at 262.

On April 2, 2014, Lois Wurzel, M.D., a non-examining State Agency consultant, concluded that Gonzalez could occasionally lift and/or carry 50 pounds; could frequently lift and/or carry 25 pounds; could stand and/or walk for a total of six hours in an eight-hour workday; and could sit for a total of six hours in an eight-hour work day.  R. at 264.  Dr. Wurzel also observed that Gonzalez could climb ramps/stairs frequently; climb ladders/ropes/scaffolds occasionally; balance without limits; and stoop, kneel, crouch, and crawl frequently.  R. at 264.  Based on those strength factors, Dr. Wurzel determined that Gonzalez's maximum sustained work capability was "medium."  R. at 266.

On April 12, 2014, Gonzalez was in a car accident and treated for his injuries at Waterbury Hospital.  Doc. No. 27-1, at 6 (citing R. at 647–51).  An X-ray of his lumbosacral spine displayed a "1 mm. retrolisthesis [at] L4-L5 that appear[ed] degenerative."  *Id*. (citing R. at 650).  The medical records noted that Gonzalez experienced lumbar tenderness and had a normal range of motion, normal strength, and no focal neurological deficits.  *Id*. at 6 (citing R. at 649).  He was prescribed Robaxim and Ibuprofen.  *Id*. at 6 (citing R. at 649).

On April 17, 2014, Robert Costanzo, D.C., a chiropractic physician, examined Gonzalez.  *Id.* at 6 (citing R. at 655).  The examination revealed various "abnormal" findings related to the

lumbar spine, and Costanzo diagnosed Gonzalez with lumbar strain/sprain, "intermittent lower

extremity radiculopathy secondary to [lumbar strain/sprain], rule out lumbar disc herniation,"

and thoracic strain/sprain. *Id*. at 6 (citing R. at 656). Gonzalez did not complain of leg pain,

numbness, or tingling. *Id*. (citing R. at 656). He was placed on a treatment plan that included

chiropractic treatment three times a week for three weeks. *Id*. (citing R. at 656).

In early May 2014, Gonzalez began treatment at Rushford (Hartford Healthcare

Behavioral Health). *Id*. at 6 (citing R. at 696). Gonzalez expressed feelings of sadness, guilt,

anxiety, and stress from not being able to provide for his family. *Id*. (citing R. at 696). He was

diagnosed with a major depressive disorder, single episode, severe without psychotic features.

*Id*. (citing R. at 694).

On May 21, 2014, at an individual therapy session at Rushford, Gonzalez reported that

his pain level was an eight out of ten. *Id*. (citing R. at 683). Gonzalez noted that his girlfriend

had to help him put on shoes because of the pain, and that sometimes using the toilet was so

painful that he was not able to wipe himself. *Id*. (citing R. at 683–84).

An MRI of Gonzalez's lumbar spine was performed on May 27, 2014, per Dr. Costanzo's

referral. *Id*. (citing R. at 570). Based on the results, Kenneth Allen, M.D., opined that Gonzalez

had "[l]umbar spondylosis from L3 through S1, with left lateral and foraminal disc protrusion at

the L3-L4 level, displacing the left L3 neve root laterally." R. at 570. Dr. Allen further observed

"[m]inor central spinal stenosis at the L4-L5 level, with loss of disc height," and "a minor bulge

of the disc at L5-S1 disc, with a small fissure in the annulus fibrosis posteriorly in the midline."

Doc. No. 27-1, at 6 (citing R. at 570).

On June 10, 2014, Balazs Somogyi, M.D., reviewed the MRI results from May 2014 and

performed a physical examination of Gonzalez. *Id*. (citing R. at 563). Dr. Somogyi wrote that

Gonzalez groaned constantly and ambulated with a "wide and severely antalgic gait," and that rotational movements, among others, were painful. *Id*. at 7–8 (citing R. at 563). Dr. Somogyi observed no muscle atrophy, and the straight leg raising test was negative. R. at 563. Based on his findings, Dr. Somogyi's impression was that Gonzalez had chronic low back pain and clinical findings suggestive of functional overlay. *Id*. at 8 (citing R. at 564). He referred Gonzalez for physical therapy, which Gonzalez did not pursue. *Id*. at 8 (citing R. at 561, 564, 566).

On August 13, 2014, Jeanne Kuslis, M.D., a non-examining State Agency consultant who assessed Gonzalez as the reconsideration level, opined that Gonzalez could occasionally lift and/or carry 20 pounds; could lift and/or carry 10 pounds frequently; could stand and/or walk for six hours in an eight-hour day; could sit for six hours in an eight-hour day; could climb ramps/stairs frequently; could climb ladders/ropes/scaffolds occasionally; could balance frequently; and could stoop, kneel, crouch, and crawl occasionally. R. at 289–90.

On August 20, 2014, Gonzalez was seen at MidState Medical Center for worsening back pain. Doc. No. 27-1, at 9 (citing R. at 634). He was advised to seek pain management treatment and offered a prescription of Prednisone, which he refused. *Id*. (citing R. at 636–37).

On August 21, 2014, Dr. Lago conducted a second psychiatric evaluation of Gonzalez. *Id*. at 9 (citing R. at 567–69). Dr. Lago observed that Gonzalez's gait was "very slow." R. at 567. Gonzalez stated that he had to stop working because of his back pain. R. at 567. Dr. Lago concluded that Gonzalez had a depressive disorder, not otherwise specified, and opined that Gonzalez was capable of adapting to a work setting from a psychiatric viewpoint. R. at 569.

On August 26, 2014, Katrin Carlson, Psy.D., a non-examining State Agency consultant, concluded that Gonzalez did not have a severe affective disorder. Doc. No. 27-1, at 9 (citing R. at 275–76, 287–88).

Paul Shahek, LCSW, and Hassam Dinakar, M.D., provided an opinion dated August 29, 2014 regarding Gonzalez's mental health. *Id*. at 10 (citing R. at 111–14). As outlined in the report, they observed that Gonzalez was depressed, anxious, irritable, and guarded, and that he had difficulty respecting and responding appropriately to others in authority and getting along with others without distracting them or exhibiting behavioral extremes. *Id*. at 10 (citing R. at 112–13).

In a report dated October 17, 2014, chiropractic physician Costanzo noted that Gonzalez complained of low back pain—which Gonzalez described as "mild to moderate and constant with sharp pain occurring daily"—and of "[i]ntermittent left leg and occasion[al] right leg pain, numbness, and tingling extend[ing] into the feet." *Id*. at 10 (citing R. at 653). Among the factors aggravating Gonzalez's pain were prolonged sitting, standing, walking, and bending. *Id*. at 10 (citing R. at 653).

Costanzo again reported "abnormal" findings relating to the lumbar spine, which included "segmental joint dysfunctions at the L3-S1 level and left sacroiliac joint motor units," as well as "[m]oderate to severe paralumbar muscle guarding . . . with myofascial irritation in the left and right iliolumbar, posterior lumbar paravertebral, left gluteal and left piriformis muscles." *Id*. at 10 (citing R. at 653). The neurological examination was negative. *Id*. at 10 (citing R. at 653). Gonzalez did not complain of leg pain, numbness, or tingling at the time of testing. *Id*. at 10 (citing R. at 653).

Costanzo's final diagnoses were: (1) residuals of lumbar strain/sprain; (2) a left lateral and foraminal disc protrusion at the L3-L4 level displacing the L3 nerve root; (3) a disc bulge at the L4-L5 level; and (4) an intermittent lower extremity radiculopathy secondary to his lumbar strain/sprain and disc protrusion at L3-L4. *Id*. at 11 (citing R. at 654). Costanzo stated that a

neurosurgical consult was necessary and advised Gonzalez to "avoid repetitive bending, heavy lifting and prolonged sitting when possible." R. at 654.

On November 10, 2014, Gonzalez was discharged from treatment at Rushford. *Id*. at 11 (citing R. at 660). His diagnoses were major depressive disorder, recurrent severe without psychotic features, and generalized anxiety disorder. *Id*. (citing R. at 662). Gonzalez reported ongoing pain at the time. *Id*. (citing R. at 663).

An MRI of Gonzalez's lumbar spine was performed on January 18, 2015 at MidState Medical Center. *Id*. at 11 (citing R. at 646). The radiologist, Dr. Bisceglia, concluded that the MRI revealed a "[l]eft foraminal disc herniation L3-4 just abutting the L3 nerve root" and a "[s]mall left lateral disc protrusion at L5-S1." *Id*. at 11 (citing R. at 646). Dr. Bisceglia also observed a "moderate disc space narrowing with disc desiccation" at L4-L5. *Id*. at 11 (citing R. at 646).

In a medical statement dated January 30, 2015 completed by Sheik Ahmed, M.D., Dr. Ahmed opined that Gonzalez would be unable to work for at least six months due to the herniated disc at L3-L4 abutting the L3 nerve root and the disc protrusion at L5-S1. *Id*. at 11 (citing R. at 723).

On March 5, 2015, Arnold Rossi, M.D., reported that Gonzalez complained of "constant, daily low back pain," "some non-radicular leg pain," and "non-anatomic numbness and paresthesiae intermittently," as well as joint pain, weakness of muscles and joints, muscle pain or cramps, difficulty walking, nervousness, anxiety, and depression. *Id*. at 12 (citing R. at 901). A musculoskeletal examination indicated a restricted range of motion in the lumbar spine. *Id*. at 12 (citing R. at 902). Both the straight leg raising test and hyperextension/compression test

produced negative results. *Id*. at 12 (citing R. at 902). Dr. Rossi also described a normal gait, muscle strength 5/5, intact sensation, and intact deep tendon reflexes. *Id*. at 12 (citing R. at 902).

Dr. Rossi stated that Gonzalez's MRI displayed a foraminal disc rupture at L3-L4 on the left, and that Gonzalez had low back pain related to his MRI finding. *Id*. (citing R. at 902). Dr. Rossi observed no signs of radiculopathy, and opined that Gonzalez was not a candidate for surgery and that his best route was instead a referral to pain management. *Id*. at 12 (citing R. at 902).

From March 2015 to April 2016, Gonzalez was treated four separate times at East Hartford Medical Center for low back pain and radiculitis. *Id*. at 12 (citing R. at 819, 829, 833, 865). Examination findings showed that inspection and palpation of Gonzalez's lumbar spine was normal, as was his spinal curvature and range of motion. *Id*. at 12 (citing R. at 831). Moreover, strength testing was full and testing for nerve root disease was negative. *Id*. (citing R. at 831). Gonzalez was treated with non-narcotic pain medication: Mobic and a Lidoderm patch. *Id*. (citing R. at 815, 819, 829, 865).

On May 29, 2015, Gonzalez began treatment with Waleska Oritz-Ayala, a nurse practitioner at New Solutions Pain Management Clinic. *Id*. at 13 (citing R. at 772). During his initial appointment, Gonzalez complained of mid-back pain bearing an intensity of ten out of ten. *Id*. at 13 (citing R. at 772). Gonzalez stated that his physical limitations included work, cutting grass, and keeping up with children's activity, and identified the following aggravating factors: sitting, standing, bending, lifting, and cold weather. *Id*. at 13 (citing R. at 772). Oritz-Ayala diagnosed Gonzalez with chronic low back pain, intervertebral disc prolapse, joint pain, and depression. *Id*. at 13 (citing R. at 773).

Gonzalez thereafter began monthly treatment with the New Solutions Pain Management Clinic and continued to see Oritz-Ayala. During his appointments with Oritz-Ayala from August 2015 through March 2016, Gonzalez reported that his pain level, with medication, was between eight out of ten and nine out of ten. Doc. No. 27-1, at 15 (citing R. at 752, 755, 758, 760, 763, 765, 767, 769). His symptoms during that time included pain in the lower back, limited range of motion, paresthesias and numbness, a broad-based gait, and tenderness in the low back. *Id*. at 15 (citing R. at 752, 756, 759, 761). Gonzalez stated that activity, sitting, standing, cold weather, and bending exacerbated his pain. *Id.* (citing R. at 767, 769). From November 2015 to March 2016, Gonzalez also noted that, with pain medication, he was able to perform daily activities and help his wife with light chores. *Id*. at 15 (citing R. at 752, 755, 758, 760, 763). Oritz-Ayala prescribed him Percocet, OxyContin, Oxycodone, and Ibuprofen. *Id*. (citing R. at 756, 759, 761–62, 764, 768, 770).

In a Medical Report for Incapacity dated June 3, 2015 prepared by Faisal Ijaz, a nurse practitioner, Ijaz wrote that Gonzalez would be unable to work for more than three months because of lower back pain stemming from the herniated disc at L3-L4 and the disc protrusion at L5-S1. *Id*. at 13 (citing R. at 896–97).

On September 28, 2018, Gonzalez was examined by Nicholas Formica, M.D., at Hartford Healthcare. R. at 734. Gonzalez complained of knee pain, which he reported experiencing primarily when he kneels, squats, and walks the stairs. Doc. No. 27-1, at 13 (citing R. at 733). Dr. Formica observed "no evidence of any muscle tenderness," "slight decreased strength in [Gonzalez's] left hip fracture versus the right" as well as an "absent right patellar deep tendon reflex." R. at 734. He diagnosed Gonzalez with chondromalacia of patella of the bilateral knees

and prescribed Nabumetone for the knee pain. Doc. No. 27-1, at 13–14 (citing R. at 733). Dr. Formica did not believe Gonzalez was a candidate for surgery. *Id*. at 14 (citing R. at 733).

In a medical report dated October 5, 2015, Dr. Ahmed again opined that Gonzalez would be unable to work for at least six months. *Id*. at 14 (citing R. at 880). In so concluding, Dr. Ahmed noted that Gonzalez had joint pain, a history of chronic low pain, a herniated disc at L3-L4 abutting the L3 nerve root, and a disc protrusion at L5-S1. *Id*. at 14 (citing R. at. 880). He further opined that Gonzalez could, throughout an eight-hour work day: (i) sit, stand, and walk for one hour at most; (ii) occasionally lift or carry eleven to twenty pounds; (iii) frequently lift or carry six to ten pounds; (iv) continuously lift or carry up to five pounds; (v) never climb or be exposed to unprotected heights; and (vi) occasionally bend, squat, crawl, and reach. *Id*. at 14 (citing R. at 881–83). The report indicated no mental functioning limitations. *Id*. at 14 (citing R. at 883–85).

On December 22, 2015, Dr. Formica examined Gonzalez, who reported that the Nabumetone did not alleviate his knee pain and specifically that he felt "mild pain" while sitting, which worsened with standing, squatting, or walking. *Id*. at 14 (citing R. at 727). Gonzalez mentioned that his low back pain also intensified with movement. *Id*. at 14 (citing R. at 727). Dr. Formica provided that "[d]imension knees reveals that the right knee is somewhat warmer than the le[ft] and both have coarse crepitus with moderate positive patellar inhibition tests bilaterally." R. at 727. Dr. Formica diagnosed Gonzalez with chondromalacia of patella, unspecified laterality, and ordered a referral to orthopedic surgery. Doc. No. 27-1, at 14 (citing R. at 726).

On February 29, 2016, Richard Matza, M.D., an orthopedic surgeon, reviewed x-rays performed on Gonzalez's knees, which, according to Dr. Matza, reflected chondromalacia. Doc.

No. 27-1, at 15 (citing R. at 750).  The physical examination showed that Gonzalez had "marked crepitus of the patellofemoral joint of both knees [and] normal neurovascular function," with no medical or lateral instability and no joint line tenderness.  R. at 750.  Dr. Matza recommended the use of collagen, Voltaren gel, and patellofemoral braces.  *Id*. at 15 (citing R. at 750).  Gonzalez obtained knee braces on April 4, 2016.  *Id*. at 15 (citing R. at 776–80).

On May 11, 2016, Dr. Ahmed prepared another opinion regarding Gonzalez's ability to perform work-related activities.[3]  R. at 787–88.  As provided in the report, Dr. Ahmed opined that, in an eight-hour work day, Gonzalez could: (i) occasionally carry/lift ten pounds; (ii) stand and walk for less than two hours; (iii) sit for less than two hours; (iv) sit and stand for 45 minutes before needing to change positions; (v) frequently climb stairs; and (vi) occasionally twist, stoop (bend), crawl, and climb ladders.  R. at 787.  According to Dr. Ahmed, Gonzalez would also need to walk around every 45 minutes and shift at will between sitting, standing, and walking.  *Id*. at 16 (citing R. at 787).

Around two weeks later, on May 24, 2016, an MRI of Gonzalez's left knee was performed at Naugatuck Valley Radiology.  *Id*. at 16 (citing R. at 903).  In reviewing the MRI, Paolo Olcese, M.D., opined that Gonzalez had a grade 2 sprain of the medial collateral ligament, a moderately large Baker's cyst, atypical periarticular cysts seen within lateral aspects of the knees, and a small joint effusion.  *Id*. (citing R. at 903).  Dr. Olcese observed no evidence of meniscal or cruciate ligament tears.  *Id*. (citing R. at 903).

---

[3] As both parties noted in their briefs, the ALJ's decision inaccurately attributed the preparation of that medical statement to Dr. Bisceglia.

B.  Procedural History

Gonzalez applied for SSDI and SSI benefits on December 16, 2013 and December 31, 2013, respectively, asserting that he had been disabled with back problems, stomach problems, and depression since July 1, 2013.  R. at 479.  The SSA denied Gonzalez's claim on April 8, 2014.  R. at 15.  Gonzalez sought reconsideration, but the SSA adhered to its decision.  *Id.*  Gonzalez thereafter requested a hearing, which was held on May 18, 2016 before ALJ Louis Bonsangue ("the ALJ").  R. at 15, 28.

At the hearing, Gonzalez described at length the pain that he experienced.  He testified that he endured constant pain in his lower back, which he described as a continuous squeeze.  *Id.* at 17 (citing R. at 177–78).  The pain was "very strong" and traveled to his left leg several times a week.  R. at 178.  Gonzalez noted that he had also been experiencing pain in his knees for two years, for which he was prescribed braces.  R. at 181.  He later expressed that the pain he experienced was "so strong" that it became difficult for him to concentrate at times, and that it hurt his back "a lot" to get up from the toilet seat because it is low.  R. at 192, 200.

Gonzalez further noted that he could only sit for ten minutes, or stand for around five to ten minutes, before his back pain intensified.  R. at 191.  Moreover, he could walk around his apartment for only several minutes and it was "very painful" for him to climb stairs.  R. at 191, 196.  Gonzalez additionally testified that he was able to drive for only ten to fifteen minutes before the pain became unbearable.  R. at 174, 178.  He also walked several times a week at the mall for thirty-five minutes; although he enjoyed some relief in his back after walking, he felt pain in his knees and was sore the following day.  R. at 188–89.

In addition, Gonzalez testified that he occasionally helped around the house.  For example, he folded laundry, washed dishes if "it's not much," cooked full meals once or twice a month, and occasionally went grocery shopping with his wife.  R. at 16 (citing R. at 174, 198).

His wife assisted him with putting on and tying his shoes, and helping him shower.  R. at 199–200.

Gonzalez explained that he discontinued his Tramadol prescription for his low back pain because of a bad reaction, and that his current medication was OxyContin.  *Id*. at 18 (citing R. at 179).  He attended pain management once a month and took the medication that his treating source prescribed daily.  R. at 187–88.  He indicated that the pain medication alleviated some, but not all, of the pain.  Doc. No. 27-1, at 17, 18 (citing R. at 191–92, 197).  Gonzalez also testified that, although Dr. Somogyi recommended that Gonzalez receive physical therapy, he declined to do so because his chiropractor at the time, Costanzo, advised Gonzalez that he "could not get that therapy in two places."  *Id*. at 18 (citing R. at 187).

The ALJ next heard testimony from Vocational Expert ("VE") Steven Sachs, Ph.D.  The ALJ asked Dr. Sachs to consider a hypothetical individual who (i) could perform work at the light exertional level; (ii) could frequently climb ramps and stairs; (iii) could never climb ropes, ladders, or scaffolds; (iv) could frequently balance; and (v) could occasionally stoop, kneel, crouch, and crawl.  R. at 206–07.  The ALJ asked whether such an individual could perform Gonzalez's past work or work in the national economy; Sachs responded that, although that individual could not perform Gonzalez's past work, he or she could work as a hand packer, production worker, and production inspector.  R. at 207.

For the second hypothetical, the ALJ asked Dr. Sachs to assume an individual who (i) could only perform work at the light exertional level; (ii) could frequently climb ramps and stairs; (iii) could never climb ropes, ladders, or scaffolds; (iv) could frequently balance; (v) could occasionally stoop; (vi) could never kneel, crouch or crawl; and (vii) must avoid work hazards, including unprotected heights.  R. at 207.  Dr. Sachs stated that such an individual would be able

16

to perform the aforementioned hand packer, production worker, and production inspector occupations. Doc. No. 27-1, at 19 (citing R. at 208).

For the third hypothetical, the ALJ asked Dr. Sachs to assume the same individual as in the second hypothetical, but with the added limitation of requiring "a sit/stand option, where the hypothetical individual is going to sit and stand several times a day at will while remaining on task." R. at 208. Dr. Sachs responded that such individual could perform a reduced number of the hand packer, production worker, and production inspector jobs. R. at 208.

For the fourth hypothetical, the ALJ asked Dr. Sachs to assume the same individual as in the second hypothetical, but with the additional limitation that the individual could perform only at the sedentary, rather than light, level of exertion. *Id*. at 20 (citing R. at 210). Dr. Sachs responded that the hand packer, production worker, and production inspector jobs would still be available for such an individual, but in smaller numbers than in the third hypothetical. R. at 210.

Gonzalez's counsel then asked Dr. Sachs to consider whether jobs would be available for the following individual: an individual limited to standing and walking for less than two hours, sitting for less than two hours, and lifting ten pounds occasionally. R. at 211. Dr. Sachs responded that no jobs exist for such an individual. *Id*. Gonzalez's counsel then asked whether any jobs would be available for an individual who was also restricted to sedentary-type work, and who needed to change positions every forty-five minutes, which included needing to walk around for five to ten minutes; Dr. Sachs responded in the negative. R. at 211. Dr. Sachs further testified that no jobs would be available for an individual who could, at most: (i) occasionally bend, squat, crawl, and reach; (ii) continuously lift five pounds; (iii) frequently lift six to ten pounds; (iv) occasionally lift eleven to twenty pounds; and (v) sit, stand, and walk for only one hour in an eight-hour work day. R. at 211.

C.  The ALJ's Decision

On or about September 23, 2016, the ALJ issued a decision concluding that Gonzalez had not been disabled as of July 1, 2013 and denying benefits.

At the first step of the five-prong inquiry, the ALJ found that Gonzalez had not engaged in substantial gainful activity since July 1, 2013.  R. at 17.

At the second step, the ALJ determined that Gonzalez's degenerative disc disease constituted a severe impairment, but that his right knee sprain, affective disorder, and alcohol dependence in remission did not.  R. at 18.  With respect to Gonzalez's mental impairments, the ALJ specifically determined that Gonzalez did not experience severe limitations in the following areas of functioning: (i) daily living, (ii) social functioning, (iii) concentration, persistence, or pace, and (iv) episodes of decompensation.  R. at 20–21.  In arriving at that conclusion, the ALJ gave "partial weight" to Dr. Lago's March 14, 2014 report, and particularly to its findings that Gonzalez suffered from depressive disorder, was capable of adopting to a work setting, and had a GAF score of 68.[4]  The ALJ similarly accorded "partial weight" to Dr. Lago's August 21, 2014 psychiatric examination, citing Dr. Lago's findings that Gonzalez's depressive features were secondary to his pain and that those features had greatly improved.  R. at 21.

The ALJ, in contrast, assigned "little weight" to the August 29, 2014 opinion of Mr. Shaker and Dr. Dinakar on the ground that their opinions concerning Gonzalez's problems in social functioning and task performance were "inconsistent with other evidence, such as the reports of Dr. Lago."  R. at 22.

---

[4] The ALJ noted in his decision that a GAF score of 61 to 70 is categorized by the American Psychiatric Association as "generally functioning pretty well and having some meaningful interpersonal relationships," with "some mild symptoms or some difficulty in social, occupational, or school functioning."  R. at 21 n.1.

At the third step, the ALJ found that Gonzalez's impairments were not per se disabling because they were not severe enough to meet the criteria of an impairment listed in 20 C.F.R. part 404, subpart P, Appendix 1. R. at 22.

Before proceeding to the fourth step, the ALJ assessed Gonzalez's residual functional capacity ("RFC") and determined that Gonzalez could perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b),[5] with the following exceptions: he (1) can frequently climb ramps and stairs; (2) can never climb ropes, ladders and scaffolds; (3) can frequently balance; (4) can occasionally stoop; (5) can never crouch and crawl; (6) must avoid unprotected heights; and (7) must be able to sit and stand at will. R. at 22.

The ALJ reasoned that, although Gonzalez's medically determinable impairments could reasonably be expected to cause the symptoms about which he testified, Gonzalez's statements "concerning the intensity, persistence and limiting effect of these symptoms are not entirely consistent with the medical evidence and other evidence . . . ." R at 23. The ALJ elaborated that Gonzalez's "repeated physical examinations, as detailed above, have not documented neurological deficits or other findings which would support the disabling degree of pain and function limitation alleged . . . Such evidence supports a light residual functional capacity, with the stated postural limitations and a sit/stand option at will." R. at 26.

In arriving at that determination, the ALJ accorded "partial weight" to the June 10, 2014 report of Dr. Somogyi. R. at 26. The ALJ also granted "partial weight" to the October 17, 2014

_____

[5] Light work is defined as: "work [that] involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.* § 404.1567(b).

opinion of Costanzo, concluding that Costanzo's recommendation that Gonzalez avoid repetitive bending, heavy lifting, and prolonged sitting, when possible, supports the light RFC finding. R. at 26.

The ALJ likewise gave "partial weight" to the October 5, 2015 opinion of Dr. Ahmed, crediting the findings in the report as follows:

> His opinion that [Gonzalez] has no evidence of limitations as a result of a mental impairment, that the claimant can never work around unprotected heights and has the lifting/carrying capabilities for 20 pounds occasionally and 10 pounds frequently, supports the residual functional capacity and is consistent with the evidence. However, Dr. Ahmed's opinion that during the course of an 8-hour workday the claimant is only capable of sitting one hour, standing one hour and walking for one hour is not supported by the imaging studies and clinical examinations.

R. at 26.

Lastly, the ALJ accorded "light weight" to Dr. Ahmed's May 16, 2016 opinion.[6] R. at 26. The ALJ reasoned that the opinion is "not consistent with the record as a whole," and that the limitation of Gonzalez to the performance of sedentary work, with occasional postural activities and the need to avoid extreme cold, "is not supported by imaging studies or clinical findings." *Id*.

At the fourth step, the ALJ found that Gonzalez did not have the residual functional capacity to perform past relevant work as a janitor. R. at 26.

At the fifth and final step, the ALJ determined—based on Gonzalez's residual functional capacity, age, limited education, prior work experience, and Dr. Sachs's testimony—that the jobs that Gonzalez could perform, which included hand packer (light/unskilled), production worker (light/unskilled), and production inspector (light/unskilled), existed in significant numbers in the

---

[6] As mentioned, the ALJ's decision incorrectly attributes that opinion to Dr. Bisceglia.

national economy.  R. at 27.  The ALJ therefore concluded that Gonzalez was not disabled from July 1, 2013 through September 23, 2016, the date of the decision.  *Id.*

### III.    Discussion

On appeal, Gonzalez contends that he is entitled to a reversal of the Commissioner's decision.  *See generally* Mot. to Reverse, Doc. No. 27.  Gonzalez principally argues that (1) the ALJ failed to properly weigh Gonzalez's descriptions of his symptoms; (2) the ALJ's residual functional capacity assessment was inadequate because (a) the ALJ did not discuss all of Gonzalez's history and (b) the ALJ failed to adequately consider the opinions of various medical sources; and (3) the ALJ's determination at step five was not supported by substantial evidence.  *See id.*

The Commissioner counters that (1) substantial evidence supports the ALJ's assessment that Gonzalez's statements about his symptoms were not entirely credible; (2) the record corroborates the ALJ's conclusion that Gonzalez could perform light work with postural restrictions; and (3) the ALJ properly relied on the vocational expert's testimony at step five.  *See generally* Mem. in Support of Mot. to Affirm, Doc. No. 30-1.

### A.    The ALJ's Decision to Discredit Gonzalez's Statements About His Symptoms is Sufficiently Specific and Corroborated by the Record.

Gonzalez first argues that the ALJ improperly discredited Gonzalez's subjective statements about his symptoms.  Social Security regulations outline a two-step process for evaluating symptoms such as pain.  *See Graf v. Berryhill*, 2019 WL 1237105, at *8 (D. Conn. Mar. 18, 2019).  First, the ALJ must assess "whether the medical signs or laboratory findings show that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's pain."  *Id.* (citing *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir.

2013)) (internal quotation marks omitted).  In doing so, the ALJ must evaluate all of the claimant's symptoms and the extent to which the claimant's symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence."  *See id*. (citing 20 C.F.R. § 416.929(a)).  The ALJ "will consider all of [a claimant's] statements about [his] symptoms, such as pain, and any description [his] medical sources or nonmedical sources may provide about how the symptoms affect [his] activities of daily living and [his] ability to work."  *Id.* (citing 20 C.F.R. § 416.929(a)).  The record must include "objective medical evidence from an acceptable medical source" that indicates that a claimant has a medical impairment that "could reasonably be expected to produce the pain or other symptoms alleged."  *Id*. (citing 20 C.F.R. § 416.929(a)).

If the ALJ determines that the first step is satisfied, he or she must then evaluate the "intensity and persistence" of the claimant's symptoms in order to determine the extent to which the claimant's symptoms limit the claimant's ability to work.  *See id*. at 7 (internal citations omitted).  In undertaking that assessment, the ALJ must consider all of the available evidence, including objective medical evidence, from both medical and nonmedical sources.  *Id*.  The ALJ, however, may not reject a claimant's subjective opinion regarding the intensity and persistence of the pain "solely because the available objective medical evidence does not substantiate [his or her] statements."  20 C.F.R. § 416.929(c)(2).

Nonetheless, if the objective medical evidence does not support the claimant's description of his symptoms, the ALJ "must consider the other evidence and make a finding on the credibility of the individual's statements."  *Graf*, 2019 WL 123710, at *7 (internal citations omitted).  Toward that end, the ALJ should consider the following: (1) the claimant's "daily activities;" (2) "[t]he location, duration, frequency, and intensity" of the claimant's pain; (3)

"[p]recipitating and aggravating factors;" (4) "[t]he type, dosage, effectiveness, and side effects of any medication" taken to alleviate pain; (5) "[t]reatment, other than medication" received for pain relief; (6) measures taken to relieve pain and other symptoms; and (7) "[o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms." *Id*. (citing 20 C.F.R. § 416.929(c)(3)).

In deciding the ultimate question of whether the claimant is disabled, the ALJ must evaluate the claimant's subjective claims of pain "in relation to the objective medical evidence and other evidence." 20 C.F.R. § 416.929(c)(4). The ALJ must specifically consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [the claimant's] history, laboratory findings, and statements by [the claimant's] medical providers or other sources concerning how [the] symptoms affect [the claimant]." 20 C.F.R. § 416.929(c)(4). The symptoms "will be determined to diminish [the claimant's] capacity for basic work activities . . . to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id*.

The ALJ's determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight." *Cichocki*, 534 F. App'x at 76 (citing Social Security Ruling 96-7p, 1996 WL 374186, at *2). Although "a single, conclusory statement" that the claimant is not credible, or a mere recitation of the relevant factors, will not suffice, "remand is

not required where 'the evidence of record permits [the court] to glean the rationale of an ALJ's decision[.]'" *Id*. (citing *Mongeur*, 722 F.2d at 1040).

Here, the ALJ acknowledged that the back impairments "could be expected to produce some degree of pain and functional limitations," but declined to fully credit Gonzalez's descriptions regarding the degree of those symptoms and resulting limitations. R. at 25–26. The ALJ reasoned that Gonzalez's "repeated physical examinations, as detailed above, have not documented neurological deficits or other findings which would support the disabling degree of pain and functional limitation" alleged by Gonzalez. *Id*. As support, the ALJ cited to examination records from December 2013 through June 2015 that suggested no neurological deficits. *See* R. at 552, 576, 649, 817, 821–22, 836, 902.

Gonzalez's argument that the ALJ improperly relied on neurological observations is unavailing. Even if the lack of neurological deficits is not determinative, the cited records reflected other findings that support the ALJ's conclusion, including (i) a normal range of motion and normal strength, R. at 649, 821; (ii) normal spinal curvature and no spinal deformity, R. at 817, 821; (iii) negative nerve root disease testing, R. at 817, 821; (iv) a normal gait, R. at 822, 902; and (v) negative straight leg testing, R. at 902.

The cited records also noted that Gonzalez declined to pursue physical therapy as Dr. Koh recommended. R. at 552. That fact supports the ALJ's assessment that Gonzalez overstated his pain. *See Dziamalek*, 2019 WL 4144718, at *11 (concluding that the ALJ was entitled to find that the claimant's refusal to engage in physical therapy and other treatment undermined the claimant's complaints about his pain).

For those reasons, I conclude that the ALJ's decision to discount Gonzalez's statements about his pain and its limiting effects is sufficiently specific and supported by substantial

evidence. Even if, as Gonzalez asserts, there is evidence that supports a contrary conclusion, the ALJ was permitted to resolve evidentiary conflicts as he saw proper when evaluating Gonzalez's credibility. *See id.* at *11; *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (internal citations and alterations omitted) ("Even assuming, as Calabrese contends, that [certain evidence] cannot support an adverse credibility determination, the ALJ's adverse credibility finding was nevertheless supported by evidence. . . . "). It is the role of Commissioner, not mine, "'to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms." *Cichocki*, 534 F. App'x at 75 (internal citations omitted); *see also Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'") (internal citations omitted).

Gonzalez also challenges the ALJ's failure to discuss: (1) why the clinical findings, along with the MRI results, did not corroborate Gonzalez's descriptions of pain; (2) the medical records from New Solutions Pain Management Clinic; (3) the medications Gonzalez was taking and specifically his need for narcotic medications to relieve his pain; (4) the factors that aggravated his pain; and (5) the impact of Gonzalez's daily activities on the ALJ's credibility finding. Mem. in Support of Mot. to Reverse, Doc. No. 27-2, at 9–11.

As a preliminary matter, Gonzalez's assertion that the ALJ failed to discuss Gonzalez's narcotic medication use is belied by the record; the ALJ did reference such use throughout the decision. *See, e.g.*, R. at 22 ("The claimant stated that he took Oxycontin, but it was not working . . . ."); R. at 23 ("He noted that medication helps the pain, but does not take it away. He also takes Ambien to help him sleep."); R. at 24 ("The claimant was given Percocet with

improvement in his pain, but was informed that the emergency room could not provide narcotic pain medications for his chronic condition.").

The ALJ also discussed in detail Gonzalez's activities of daily living.  *See, e.g.*, R. at 23 ("[Gonzalez] described walking with his wife at the mall for about 35 minutes as therapy. Although his back feels good after walking, he stated he has knee pain."); *id.* ("He stated he does some chores, such as helping with cooking and helps fold the laundry. Specifically, the claimant testified that he lifts the pots and pans onto the stove and cooks a full meal once or twice per month."); *id.* ("He alleged that he needs help in the shower as well as with dressing and tying shoes."); *id.* ("He stated he went to Puerto Rico with his wife to keep her company."); *id.* ("The claimant maintained that driving is very difficult for him and that he can drive for no more than 10 to 15 minutes because of the seating position."); *id.* ("He also maintained that after 5 to 10 minutes of standing he experiences knee pain and that he is constantly changing position at home.").

In any event, it is well-settled that when "the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011) (internal citations omitted); *see also Barringer v. Comm'n of Social Security*, 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005) ("[A]n ALJ is not required to discuss all the evidence submitted, and [his] failure to cite specific evidence does not indicate that it was not considered.") (internal citations omitted).

Similarly, any failure to discuss the seven factors listed in 20 C.F.R. § 416.929(c)(3) does not merit remand when the ALJ "thoroughly explained his credibility determination and the

record permits [the court] to glean the rationale of the ALJ's decision." *Cichocki*, 534 F. App'x at 76; *see also Wischoff v. Astrue*, 2010 WL 1543849, at *7 (W.D.N.Y. Apr. 16, 2010) ("Failure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are 'sufficiently specific to conclude that he considered the entire evidentiary record in arriving at his determination.'") (internal citations omitted). To the extent the cases to which Gonzalez cites—*Buchannon v. Colvin*, 636 F. App'x 414, 415 (9th Cir. 2016), and *Bryan v. Commissioner of Social Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010)—provide otherwise, they are not binding and I decline to follow them.

In sum, because the ALJ's adverse credibility decision is sufficiently specific and supported by substantial evidence, Gonzalez's argument fails and remand is not warranted on that ground.

B. The ALJ's Determination that Gonzalez Retained the Residual Functional Capacity to Perform Light Work with Postural Limitations is Supported by Substantial Evidence.

Gonzalez next argues that the ALJ's residual functional capacity finding was inadequate because (1) various parts of Gonzalez's medical history—such as the treatment notes from New Solutions Pain Management Clinic and Gonzalez's activities of daily living—were not discussed; and (2) the ALJ failed to properly weigh various medical opinions, including Dr. Ahmed's reports. *See* Mem. in Support of Mot. to Reverse, Doc. No. 27-2, at 12–13.

First, as discussed, any failure to discuss certain pieces of evidence does not constitute automatic grounds for remand. *Mongeur*, 722 F.2d at 1040 ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.").

Second, the ALJ articulated sufficient reasons for granting "little weight" to Dr. Ahmed's May 2016 medical statement and "partial weight" to his October 2015 statement.  The SSA "recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant."  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted).  According to the rule, the ALJ should defer to "the views of the physician who has engaged in the primary treatment of the claimant," but need only assign those opinions "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the claimant's] case record."  *Cichocki*, 534 F. App'x at 74 (internal quotation marks and citations omitted).

An ALJ who declines to accord "controlling" weight to the medical opinion of a treating physician must consider several factors in determining how much weight it should receive.  *See Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(d)(2)).  Among those factors are: "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."  *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129).  After considering those factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion."  *Burgess*, 537 F.3d at 129 (internal citations omitted).  When the "treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinion of other medical experts," the opinion of the treating physician is not entitled to controlling weight.  *Id*. at 128.  "Failure to provide such 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand."  *Id.* at 129–30 (internal citations omitted).

Applying those principles to the present case, I conclude that the ALJ provided good reasons for declining to assign Dr. Ahmed's October 2015 and May 2016 statements controlling weight. With respect to the October 2015 opinion, Dr. Ahmed determined that Gonzalez could occasionally lift and carry up to 20 pounds, could occasionally bend, squat, crawl, and reach, and could never climb or be around unprotected heights. R. at 881–82. The ALJ credited those findings.

The ALJ, however, rejected Dr. Ahmed's opinion that Gonzalez could sit, walk, and stand for only one hour in an eight-hour work day, reasoning that those limitations were inconsistent with "the imaging studies and the clinical findings." R. at 26. For that same reason, the ALJ also rejected Dr. Ahmed's May 2016 statement, which restricted Gonzalez to sedentary work with occasional postural activities and the need to avoid extreme cold. *Id.*

With respect to imaging studies, the ALJ discussed those studies at length throughout the opinion. *See, e.g.*, R. at 23 (discussing a November 20, 2013 x-ray of Gonzalez's lumbar spine, which showed "a disc height loss at L4-L5"); R. at 24 (noting a May 27, 2014 MRI scan of Gonzalez's lumbar spine, which revealed "lumbar spondylosis from L3 through S1 as well as minor central spinal stenosis at L4-L5"); *id.* (describing a January 18, 2015 MRI scan of Gonzalez's lumbar spine, which indicated "a left foraminal disc herniation at L3-4 just abutting the L3 nerve root" and a "small left lateral disc protrusion at L5-S1").

As another example, the ALJ described in detail the opinion of Dr. Rossi, a neurosurgeon who examined Gonzalez on March 5, 2015. As the ALJ noted, Dr. Rossi observed that Gonzalez had a limited range of motion of the lumbar spine but no lumbar muscle spasm. R. at 24. The ALJ also mentioned Dr. Rossi's finding that the straight leg raising was negative, that Gonzalez's gait and station were normal, that Gonzalez had 5/5 strength throughout, and, further,

that Gonzalez's deep tendon reflexes were intact and symmetrical.  R. at 24.  Moreover, upon reviewing the MRI scan, Dr. Rossi opined that Gonzalez "had chronic low back pain related to his MRI findings of a foraminal disc rupture at L3-4 on the left," but that Gonzalez "was not a surgical candidate and had nothing by history or examination to suggest radiculopathy."  R. at 24.

With respect to other clinical findings, as the ALJ elaborated earlier in his decision, Gonzalez's physical examinations "have not documented neurological deficits or other findings" that would suggest greater functional limitations.  R. at 26.  Indeed, as detailed in the ALJ's opinion, multiple medical sources identified no neurological deficits.  *See, e.g.*, R. at 23 (discussing December 10, 2013 report authored by Koh, who found that Gonzalez had "no focal neurologic deficits"); R. at 24 (describing March 9, 2014 visit to ER, during which Gonzalez's "[n]eurologic examination was unremarkable"); R. at 26 (citing to records from December 2013 through June 2015 that indicated no neurological deficits).  The ALJ further noted that multiple straight leg raising tests were negative.  *See, e.g.*, R.at 24 (noting Dr. Somogyi's opinion that the straight leg raising test was negative bilaterally and that "[n]o muscle atrophy or abnormal reflex patterns were seen").

The ALJ discussed numerous other medical opinions that support his capacity assessment and undermine Dr. Ahmed's.  For example, the ALJ highlighted how Gonzalez was evaluated by Kishore Thakur, M.D., on March 9, 2015 for back pain at East Hartford Medical Center.  R. at 25.  Dr. Thakur noted that Gonzalez's pain was "intermittent" and a "3-4 mild, stable since last visit."  R. at 25 (citing R. at 833).  The ALJ also cited the following observations by Dr. Thakur:

> [Gonzalez] had a normal gait, symmetrical deep tendon reflex and intact sensation. Range of motion testing revealed no restriction or instability related to ligamentous laxity. Muscle strength testing was 5/5 in all major muscle groups. Special testing of the joints for range of motion, nerve compression, and joint contracture was within normal limits.

R. at 25.

For the foregoing reasons, I conclude that the ALJ provided a sufficient explanation, supported by substantial evidence, for not assigning controlling weight to Dr. Ahmed's opinions. In light of the evidence discussed above, and the additional evidence that I discuss below, I further conclude that the record contains substantial evidence that amply supports the ALJ's finding that Gonzalez retained the residual functional capacity to perform activities at the light level of exertion with postural limitations. For example, a medical statement dated April 2, 2014 authored by Dr. Wurzel, a non-examining state agency consultant, provided that Gonzalez could, at most: (i) occasionally lift and/or carry 50 pounds; (ii) frequently lift and/or carry 25 pounds; (iii) stand and/or walk for about six hours in an eight-hour work day; (iv) sit for about six hours in an eight-hour work day; (v) climb ramps/stairs frequently; (vi) climb ladders/ropes/scaffolds occasionally; and (vii) stoop, kneel, crouch, and crawl frequently. R. at 254. Dr. Wurzel ultimately concluded that Gonzalez could perform "medium" work. R. at 254–56.

Jeanne Kuslis, M.D., a non-examining State Agency consultant, evaluated Gonzalez at the reconsideration level on August 13, 2014 and concluded that Gonzalez could perform "light" work. R. at 279. Dr. Kuslis's report provided that Gonzalez could, at most: (i) occasionally lift and/or carry 20 pounds; (ii) frequently lift and/or carry 10 pounds; (iii) stand and/or walk for six hours in an eight-hour work day; (iv) sit for six hours in an eight-hour work day; (v) frequently climb ramps/stairs; (vi) occasionally climb ladders/ropes/scaffolds; (vii) frequently balance; and (viii) occasionally stoop, kneel, crouch, and crawl. R. at 277–78.[7]

---

[7] Gonzalez avers that, because the ALJ "never determined how much weight, if any, should have been given to the opinion of the State Agency non-examining consultants . . . their opinions were not a basis for the ALJ's RFC finding." Doc. No. 27-2, at 15. As discussed, the failure to explain certain evidence is not necessarily indicative of a failure to consider such evidence. In any event, I may consider the consultants' opinions, both of which were before the ALJ, in determining whether substantial evidence supports the ALJ's decision. *See Berry v.*

Moreover, contrary to Gonzalez's assertion, Costanzo's instruction that Gonzalez avoid repetitive bending, heavy lifting, and prolonged sitting when possible supports the ALJ's conclusion that Gonzalez could perform work at the light exertional level, as the ALJ noted. R. at 654. Gonzalez, who bears the burden of proving that he is disabled, has cited to no authority for his proposition that performing light work would require Gonzalez to bend repetitively. Mem. in Support of Mot. to Reverse, Doc. No. 27-2, at 15. Moreover, the Second Circuit in *Lewis v. Colvin*, 548 F. App'x 675, 677 (2d Cir. 2013), concluded that an ALJ's determination that a claimant could perform "light work" was supported by a doctor's recommendation that the claimant avoid heavy lifting and his assessment of "mild limitations for prolonged sitting."

Gonzalez's argument that the ALJ's reliance on Dr. Somogyi's report was misplaced likewise fails. To the extent Gonzalez argues that the ALJ should not have relied on Dr. Somogyi's statement because Dr. Somogyi "did not provide an opinion as to the plaintiff's exertional functional capacity regarding sitting, standing, walking, lifting/carrying, etc.," that argument is without merit. It is well-established that ALJs are required to consider all relevant medical evidence, not just certain medical opinions, in assessing the residual functional capacity. *See Greek*, 802 F.3d at 374 n.2 ("The Commissioner determines the claimant's 'residual functional capacity' based on 'all the relevant medical and other evidence of record.'") (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)).

Gonzalez next argues that the ALJ erred by failing to consider the June 2015 statement prepared by nurse practitioner Faisal Ijaz, R. at 718–22. *See* Mem. in Support of Mot. to

---

*Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982) ("[T]he absence of an express rationale does not prevent us from upholding the ALJ's determination regarding appellant's claimed listed impairments, since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence."); *Graf*, 2019 WL 1237105, at *6 ("The reasoning for that portion of the ALJ's step three decision can be discerned from the record. Although the ALJ did not reference the record for support for her findings in her written decision, there is support for her findings throughout the record.").

Reverse, Doc. No. 27-2, at 14.  To be sure, the ALJ was required to take into account Ijaz's opinion, even though she does not qualify as an "acceptable medical source."  *See* 20 C.F.R. § 404.1527(d)) ("Regardless of its source, we will evaluate every medical opinion we receive"); *Monette v. Colvin*, 654 F. App'x 516, 518 (2d Cir. 2016) ("a nurse practitioner is not an 'acceptable medical source' whose opinion is eligible for 'controlling weight'"); *see also* 20 C.F.R. § 404.1502 (defining acceptable medical sources).

Any such error, however, does not warrant remand.  Gonzalez has not demonstrated how Ijaz's opinion, which provides that Gonzalez would not be able to work for at least three months, offered new information or would compel a different conclusion, particularly because Dr. Ahmed's reports articulated more specific and restrictive functional limitations.  *Zabala v. Astrue*, 595 F.3d. 402, 409 (2d Cir. 2010) ("Such an error [to consider a treating physician's opinion] ordinarily requires remand to the ALJ for consideration of the improperly excluded evidence, at least where the unconsidered evidence is significantly more favorable to the claimant than the evidence considered. . . . Remand is unnecessary, however, [w]here the application of the correct legal standard could only lead to one conclusion.") (internal citations and quotation marks omitted).

Moreover, Ijaz's report was wholly lacking in detail and therefore of minimal probative value.  *See Monette v. Colvin*, 654 F. App'x 516, 519 (2d Cir. 2016).  The crux of the opinion— that Gonzalez could not work for at least three months—is also not particularly instructive, both because an individual is disabled only if he or she cannot engage in "substantial gainful activity. . . for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1), and because that determination is within the discretion of the Commissioner, 20 C.F.R. § 404.1527(d)(1) ("A

statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").

Gonzalez further argues that, because the ALJ did not afford "significant or great weight to any medical opinion," he based his decision on "his own interpretation of raw medical data." Mem. in Support of Mot. to Reverse, Doc. No. 27-2, at 16. That contention is belied by the record; as discussed above, it is clear from the decision that the ALJ premised his decision on medical opinions, not on his individual interpretation of raw medical evidence. The case here is therefore inapposite from the cases upon which Gonzalez relies. *See, e.g.*, Recommended Ruling, *Knapp v. Colvin*, No: 3:14-cv-1018 (D. Conn. 2017), *approved and adopted* on Feb 16, 2017 ("Because the ALJ rejected – or failed to explicitly consider – all of the opinion evidence in the record concerning plaintiff's RFC, the Court is unable to determine whether the ALJ based his RFC determination on anything other than his own judgment."); *Goble v. Colvin*, 2016 WL 3179901, at *6 (W.D.N.Y. June 6, 2016) ("Moreover, and contrary to what the Commissioner claims here, the ALJ's RFC determination must be supported by competent medical opinion; the ALJ is not free to form his own medical opinion based on the raw medical evidence.").

For the foregoing reasons, I conclude that the ALJ's RFC determination is supported by substantial evidence. Remand is therefore not warranted on that basis.

C. The ALJ Properly Relied on Dr. Sachs's Testimony at Step Five.

Gonzalez further argues that the ALJ's decision at step five was not supported by substantial evidence because (1) the ALJ's residual functional capacity finding was flawed and, therefore, Dr. Sachs's testimony was premised on an erroneous hypothetical; and (2) the hypothetical posed to Dr. Sachs was not consistent with the RFC finding made by the ALJ. Mem. in Support of Mot. to Reveres, Doc. No. 27-2, at 16. Both arguments are unavailing.

Because, as discussed, the RFC finding was supported by substantial evidence, the first argument fails. *See Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir. 2011) ("[b]ecause we have already concluded that substantial record evidence supports the RFC finding, we necessarily reject [the plaintiff's] vocational expert challenge").

With respect to the second argument, I note at the outset that Gonzalez inaccurately described the hypothetical posed to Dr. Sachs in his brief. According to Gonzalez, the ALJ's hypothetical individual was restricted to a "sit/stand option several times a day while remaining on task," rather than a "sit/stand option at will" as described in the RFC finding. Doc. No. 27-2, at 16. The ALJ, however, asked Dr. Sachs to assume an "hypothetical individual [who] is going to sit and stand several times a day *at will* while remaining on task." R. at 208 (emphasis added).

Moreover, I conclude that the hypothetical posed did essentially mirror the limitation incorporated into the RFC assessment—namely, that Gonzalez must be able to sit and stand at will. Because the hypothetical "capture[d] the concrete consequences of [Gonzalez's] impairments," any discrepancy between the hypothetical and RFC finding is of no moment. *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (internal citations omitted).

## IV. Conclusion

For the reasons set forth, I **grant** the Commissioner's motion to affirm and **deny** Reid's motion to reverse. The Clerk is directed to enter judgment in favor of the Commissioner and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 25th day of March 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
